[No. G016713. Fourth Dist., Div. Three. Oct. 3, 1997.]

BERNARDINE W. CASENAS, Plaintiff and Appellant, v. FUJISAWA USA, INC., Defendant and Respondent.

**COUNSEL**

Thomas G. Hahn for Plaintiff and Appellant.

Perkins Coie, Charles F. Palmer and Randi Maurer for Defendant and Respondent.

**OPINION**

SONENSHINE, J.—Bernardine W. Casenas appeals from a summary judgment entered in favor of her former employer, Fujisawa USA, Inc. (Fujisawa). She contends there were triable issues of fact whether, after she complained about sexual harassment, her employer unlawfully retaliated against her, making her working conditions so intolerable as to constitute wrongful constructive discharge.

We affirm, finding the trial court properly put an end to the case. We publish our opinion because Fujisawa's conduct is a textbook example of how to respond appropriately to an employee's harassment complaint. We do not know what more the employer could have done to accommodate Casenas, short of ceding its managerial prerogative to her. As we will explain, Casenas was not entitled to present her case to a fact finder: As a matter of law, no reasonable employee in her position would have found the working conditions so egregious as to compel resignation.

I

The following facts are based largely on the court's statement of materially uncontradicted evidence leading it to grant Fujisawa a summary judgment.

Fujisawa is engaged in the pharmaceutical products industry. Casenas began her employment as a professional sales representative (PSR) on February 3, 1986, in Philadelphia. At her request, she was transferred to Southern California at the end of 1987. Her district manager was Jeff Brown until early 1989, when he was transferred to another district and replaced by Casey Bernson.[1] Brown and Bernson reported to Dennis Ison, regional sales director.

Under Fujisawa's evaluation system, PSR's are initially appraised by their district manager. A draft appraisal goes to the regional sales director who reviews it in comparison to the sales performances of all PSR's in the region. The appraisal is then sent to the national sales manager for review, revision and approval, to ensure application of uniform standards nationwide. The personnel department does the final review. PSR's are given an overall rating of "outstanding," "highly commendable," "commendable" or "improvement needed" based on specific performance criteria in numerous areas. Merit salary increases tied to the performance evaluation range from 0 to 10 percent.

Casenas did very well at Fujisawa, earning many bonuses and much praise.[2] In the February 1988 appraisal of her previous year's performance in Philadelphia, she received a "highly commendable" rating and an 8 percent merit increase. In the March 1989 appraisal of work she performed during 1988, Casenas was again rated "highly commendable" and given a 7 percent increase.[3] The latter appraisal was determined prior to March 7, 1989, by Brown, Ison and Rick Lamb, then Fujisawa's national sales manager, and

[1]Brown's transfer was unrelated to and occurred before Casenas's complaint of sexual harassment. Thus, at the time she made the problem known, he was no longer in any position of authority over her.

[2]The record contains a number of congratulatory letters, memos and announcements of monetary awards for Casenas's achievements. In particular, on March 9, 1989, Rick Lamb awarded Casenas $2,000 "as partial reward" for her "successful efforts" in a sales campaign; on March 29, Ison congratulated her for placing in the "top third" of her district in another program, qualifying her for "award credits" to be used as she chose; and on April 12, Ison again praised Casenas for her "significant accomplishment . . . result[ing from] hard work, proper planning, and focused selling efforts." He noted, "Achievement of sales goals is the engine that drives successful salespeople and you can count yourself among this group. We thank you for your efforts and contributions and we thank you for 'creating success by doing it right.' " Bernson added his personal handwritten comment to the letter: "This is getting to be a habit. Congratulations!" Finally, on June 8, Ison sent a bonus check in recognition of Casenas's efforts during the first quarter of 1989, thanking her for her work and stating, "I trust you will continue your dedication to the sales and profit task during the second quarter of 1989."

[3]Five PSR's reported to Brown. His recommended wage increases were 0 percent for one, 5 percent for another, 6 percent for a third, and 7 percent for the remaining two, including Casenas.

reviewed by Barbara Sheiman, the company's personnel manager at the time. The sales statistics revealed Casenas achieved 105 percent of her sales goal for 1988, ranking her at about the 55th to 60th percentile among PSR's—her territory was number 60 out of 131. Her district finished 13th out of 14 districts nationally. Casenas received a promotion to senior sales representative.[4]

Casenas was, however, unhappy with her 1989 appraisal. On March 18, she sent a memo to Sheiman, listing some specific accomplishments which had not been mentioned, objecting to the employer's choice of words in minor criticisms, noting the overall excellence of her services, and complaining about her salary increase which, at 1 percent less than the prior raise, she believed falsely implied her 1988 performance was inferior to that of 1987. On a positive note, she expressed her appreciation for Bernson; she believed him far more capable than Brown of managing the district. She "look[ed] forward to working under [Bernson's] strong leadership and guidance."

Ison responded to the memo. After reviewing the appraisal, he wrote to Casenas on April 7, agreeing some of the suggested changes should be made. He told Casenas he was instructing Brown to "upgrade" the rating in one performance area and prepare an appraisal addendum stating the approved modifications. However, Ison noted, "I have recalculated the performance rating and this change does not alter the overall rating of highly commendable or the merit increase of 7 percent. This already acknowledges a fine performance by you this past year." Ison further stated he had found "several inaccuracies" in Casenas's memo and asked her to schedule a meeting with him to discuss the issues face-to-face.

Casenas replied with an April 21 letter, demanding Ison "specify . . . in writing" what he meant by inaccuracies in her previous memo. Four days later, she sent Sheiman another memo (with a copy to Ison), again objecting to the appraisal, criticizing Brown on a broad range of management issues and, for the first time, accusing him of sexual harassment.[5] She concluded, "Jeff Brown's continued critical and condescending comments during work

---

[4]Casenas contends she was not really "promoted," but simply made a natural progression to the next level. The semantics are of little consequence. She moved up the corporate ladder.

[5]Casenas identified five incidents: (1) In Palm Springs on a business trip, Brown told her she could buy a pair of shorts and wear them; (2) the same day, he "grabbed and held" her hand and pulled her toward him; (3) he "frequently brought up the topic of penile implants and the ways in which they are implanted" (Fujisawa is in the business of selling antibiotics used in conjunction with penile implantation); (4) he requested her to tape X-rated movies she and her husband had available on their satellite system; and (5) he asked her whether she "got aroused watching X-rated movies." Casenas made it clear to Brown his sexual comments and hand grabbing were unwelcome and inappropriate.

contacts, his derogatory remarks, his total lack of support and encouragement along with his attempt to discredit my character and reputation are reprehensible, demotivating, and demoralizing. [¶] I feel that my rejection of his sexual advances and my obvious disgust to his sexual harassment was the reason for the unfair performance review evaluation he gave me and his unfair treatment and criticisms of my performance. [¶] . . . [¶] I am . . . asking [Fujisawa] to take formal action so . . . this activity is not permitted to continue. I have also notified the Equal Employment Opportunity Commission of the sexual harassment to ensure that matters are appropriately investigated. [¶] After reviewing this document, please contact me so . . . we can mutually discuss what corrective measures are going to be taken to ensure that this activity ceases and I am permitted to work in an environment free of harassment and intimidation."

On April 28, Sheiman, unable to reach Casenas by telephone, left a message on her answering machine. Casenas returned the call on April 30, advising Sheiman her earliest available date to discuss the sexual harassment allegations would be May 9.

Sheiman and Casenas met as planned. The very next day, investigating the matter, Sheiman and Ison questioned Brown in detail about each incident mentioned in Casenas's April 25 memo. Over the next week, they also interviewed each of the PSR's who reported to Brown, as well as a former PSR, recently resigned, and a management level person from a related corporate enterprise. In the meantime, Casenas's appraisal was again reviewed by Ison, Lamb and Sheiman; Quincy Williams, Fujisawa's president, also looked at it. Based on company statistical data, the executives concluded the appraisal was accurate and adequate: Casenas's performance confirmed her place at about the middle of Fujisawa's sales force, justifying a general rating of "highly commendable," but not "outstanding." They further found Casenas's 7 percent increase, at the very top of the merit increases recommended by Brown, did not indicate retaliation.

On June 9, Bernson and Ison flew from Salt Lake City to Los Angeles for a face-to-face meeting with Casenas. When she declined to discuss her concerns, they did not press her. They gave her a June 7 letter written to her by Sheiman, summarizing the investigation findings and advising Casenas of the actions taken regarding Brown. Inter alia, the letter states, "Mr. Brown will receive a written reprimand and warning specifying his errors and warning that any repetition may be grounds for severe discipline, including termination. This written warning will be placed in Mr. Brown's personnel file. In addition, Mr. Brown will be instructed that he is to initiate no communications or contact with you, other than that which may be occasioned incidentally as a result of joint events involving your district and his

district. He also will be instructed that in the future he is to initiate no contact with your supervisors concerning you, your job performance, or any evaluation of your job performance." Sheiman added, "I want to assure you again that our company takes its policy on sexual harassment of employees very seriously. We very much appreciate your coming forward with your concerns in that regard and encourage you to do so in the future." She urged Casenas to contact her if she had any questions.

On June 12, Ison wrote a formal reprimand to Brown, which he and Lamb personally delivered. The document detailed the findings as to Casenas's allegations, stating, inter alia, "While we did not find evidence that you made overt sexual advances to Ms. Casenas, it is apparent that you exhibited extremely poor judgment in some of your actions and in statements made to Ms. Casenas and to others in your district. Intentional harassment is not necessary for sexual harassment to have occurred; the emphasis lies in how your actions or statements are viewed by those with whom you work. Ms. Casenas and other employees found some of your statements and conduct inappropriate and offensive as did Barbara Sheiman and I."

Ison's letter further advised Brown of several conclusions reached: His persistent statements about penile implants were offensive to female representatives and not necessary to the sales promotion he was advocating; his discussions with Casenas and others about X-rated movies and sexual arousal, his comments about sexual anatomy and function to female employees, and his sexually oriented humor were "unacceptable" and reflected "extremely poor judgment" on his part. Brown was cautioned, "Any recurrence of [such] conduct . . . will be grounds for severe discipline, including termination."

Further, Brown was warned that regardless of his intentions in suggesting Casenas should wear shorts in Palm Springs (hot weather) or in taking her by the hand (to keep her from losing her balance), he "should understand that as a matter of company policy, no manager should urge any other employee to wear more provocative dress. Nor should any manager physically touch or handle another employee in a manner which could be considered sexually provocative." Ison once again reminded Brown, "Violation of these policies will result in severe discipline, including termination."

Finally, the reprimand directed Brown not to talk about Casenas, her job status or the situation with anyone except designated management personnel, and to refrain from "initiating any contact whatsoever" with Casenas. Ison concluded with a warning which left no room for misinterpretation: "In

short, avoid [Casenas]. Violation of these directives will be grounds for immediate termination."[6]

Casenas remained unhappy. On June 14, she wrote to Ison, advising him she was "upset and disappointed by [his] decision to support Jeff Brown's evaluation of [her] performance . . . as a seven . . . percent." She reminded Ison she had surpassed her goal and was first in her region in percent of sales goal achievement. She again stated her belief Brown had used the appraisal to "punish [her] in retaliation for [her] rejection of his sexual advances and sexual harassment." She asked Ison to "re-assess [the] appraisal of seven percent and further amend [the] performance evaluation to reflect an outstanding ten percent merit increase." She again demanded a written response from Ison.

Ison wrote back on June 26, repeating his willingness to meet with Casenas and reminding her of his "management practice and that of [Fujisawa] to discuss [such] matters . . . on a face-to-face basis, so as to allow full discussion of the issues and . . . avoid misunderstandings of emphasis or meaning."

Casenas responded to Ison on July 13, this time with four items on her agenda. She first argued that from a business perspective, face-to-face meetings are ill-advised. She said, "Sound management practices appreciate the importance of clarifying issues through clear and concise memos. Once there is the appropriate clarification in writing, a meeting to further discuss these issues would be important." She next expressed her "anger and frustration over not being considered as a candidate for the district manager position in Los Angeles." She charged Brown with having failed to give her the chance to interview for the position on one occasion in the past, "reflective of [his] attempt to punish [her] for [her] rejection of his sexual overtures."[7] She then stated her "concern and frustration" about Ison's failure to upgrade her performance appraisal as requested in her prior correspondence. Finally, she told Ison of her "reluctance to attend" an

---

[6]The formal reprimand was subsequently reinforced by Ison in several conversations with Brown. Inter alia, he warned Brown to make no comments of a sexual/gender nature, humorous or otherwise, to any Fujisawa employee and to refrain from discussing Casenas with anyone or contacting or approaching her in any way. He also told Brown violation of any of the company's directives, including actions judged to be retaliatory, would be grounds for immediate termination.

[7]Casenas admitted in her deposition that the position in question was filled by a more qualified person—Bernson. For that reason, further reference to the incident would be pointless.

upcoming training meeting in Los Angeles because Brown would be partic-ipating and might use the opportunity to "intimidate and/or further harass" her.[8]

In a written response on July 20, Ison advised Casenas, "Out of sensitivity to your feelings and because this upcoming training meeting follows so closely upon the completion of the company's investigation of your com-plaints of discrimination against Mr. Brown, I will authorize on a one time basis your attending the training portion . . . at another location and at Company expense." He said Bernson would contact Casenas to make ar-rangements for her to attend a training session in Chicago. As for Casenas's continuing refusal to discuss other issues in person despite his repeated requests, Ison finally insisted, saying, "Now is the time to have this meeting. [Bernson] will call you to arrange a meeting among the three of us imme-diately after the adjournment of his pre-training [session] on July 26 at 4:30 p.m."

Casenas spoke with Bernson on July 25 and agreed to meet with him and Ison at the appointed time. She prepared a list of six items she wished to discuss: (1) the "several inaccuracies" to which Ison had previously alluded; (2) her appraisal; (3) her having been passed over for a district manager position; (4) the "one-time" limitation on arrangements for her attendance at meetings in a location separate from Brown; (5) Ison's July 20 letter in general; and (6) her current performance status.

At the July 26 meeting, Ison, Bernson and Casenas spent more than five hours going over every item on Casenas's agenda. The only subjects dis-cussed were concerns which Casenas had raised earlier or brought up at the time. Casenas took voluminous notes, indicating, inter alia, Ison's and Bernson's expressions of support for her goal of becoming a sales manager. At the conclusion of the meeting, Casenas left the room, apparently without any interference by Ison or Bernson.

There were no further communications until August 10, when Casenas sent Ison a letter, stating she was "involuntar[ily] resigning" from Fujisawa

---

[8]Casenas sent Sheiman a copy of her letter to Ison, along with a letter advising Sheiman she should be aware Brown had given her false versions of some of the sexual incidents. She also asked for revision of her appraisal "to properly reflect [her] excellent performance" of the prior year. She expressed her disappointment with the investigation report, noting "it didn't seem to reflect the strength and tenor of the complaints by another [PSR]." Without reference to specifics, she concluded, "Jeff Brown has essentially admitted that he did these things and still continues to carry on just as before allowing him further opportunity to exploit and sexually harass other women." Upset that Brown had received "only a letter and nothing more," she told Sheiman the company had "essentially condone[d] sexual harassment by sending the message that it is not a punishable offense."

as of August 15. She acknowledged Ison and Bernson had no complaints about her highly commendable performance, yet it had become apparent to her she "no longer [had] a career with advancement opportunity." She added, "It is obvious that I will never be made a manager and that my career is essentially over no matter how hard I work. As this comes so close to my complaint about Jeff Brown's sexual harassment, I believe this is a retaliatory action against me for going to the Equal Employment Opportunity Commission."

Ison responded on August 15, saying he and Bernson were both "extremely sorry to hear" of Casenas's decision. The letter stated, inter alia, "We want to assure you that in no way do we wish for you to leave the company and [we] are disappointed that you have decided to take this step." Ison emphasized his belief the company had done everything that could be done to "insulate" Casenas from "every conceivable impact [her] previous manager . . . could possibly have upon [her] and [her] career at [Fujisawa]." He noted the lengths to which the company had gone, such as Bernson excusing himself from a general district luncheon to personally escort Casenas "to a separate dining area," where he lunched with her "so that [she] would not encounter [Brown]." He reminded Casenas he had agreed to consider all future situations on a case-by-case basis, for as long as necessary, out of sensitivity to Casenas's discomfort at being in Brown's presence.

In regard to Casenas not having been considered for a district manager position, he referred to Casenas's oft-stated written and oral career goal along a different path—of becoming "a Senior and then an Executive Sales Representative, short term, and to have a Speciality Sales Assignment, long term." Because of that goal, he explained, Casenas "would not have been reviewed in the committee's review of potential candidates for management." Ison reminded Casenas that at the five-hour meeting, when Bernson learned of Casenas's desire to be a district sales manager, "he committed himself to do everything in his power to support [her] towards [that] goal." Additionally, Bernson had told Casenas "he would rely upon [her] to provide leadership in his district and to concentrate upon achieving a high level of performance . . . . actions necessary for developing and demonstrating management potential." Bernson also assured Casenas he would give her "opportunity for growth and promotion." Ison recalled that at the end of the meeting, Casenas's parting statement was she would give Bernson her best effort. Finally, reminding Casenas she had a manager committed to her development, Ison told her she was mistaken in believing she had no opportunity for advancement at Fujisawa.

The correspondence ended. After filing her administrative agency claim against Fujisawa, Casenas initiated the underlying suit for damages.

The following allegations are the basis for Casenas's constructive discharge claim: "Commencing after the filing of a sexual harassment charge against . . . Brown with defendant and later [June 1989] with [the] governmental agency and continuing through August 15, 1989, . . . FUJISAWA by its managerial agents . . . Ison and . . . Bernson, engaged in a course of conduct that was intended to cause intolerable working conditions such that a reasonable person in plaintiff's position would be compelled to resign. Specifically said agents engaged in the following acts: [¶] (a) Refusing to change an unfair performance appraisal made by . . . Brown in retaliation for plaintiff's rejection of his sexual advances. [¶] (b) Retaliating against plaintiff for filing a sexual harassment charge against . . . Brown by refusing to consider plaintiff for managerial advancement positions and failing to notify [her] of [an] upcoming managerial qualifying examination. [¶] (c) Requiring plaintiff to meet at a hotel alone with two male supervisors for over five hours for a night time purported 'meeting' to discuss plaintiff's charges of retaliation which 'meeting' only ended when plaintiff walked out. [¶] (d) Making derogatory remarks regarding plaintiff to plaintiff's co-employees.[9] [¶] (e) Supervisors refused to discuss with plaintiff what she needed to do to qualify for managerial positions or to review plaintiff's file and tell plaintiff what she needed to do to qualify for a managerial position. [¶] (f) [Ison] instructing plaintiff not to put [her] employment concerns in writing."

After answering the complaint, Fujisawa moved for summary judgment, contending the evidence upon which Casenas alleged constructive discharge failed, as a matter of law, to meet the threshold requirement to establish the cause of action, i.e., no reasonable person could conclude Casenas was forced to resign due to actions or conditions so intolerable or aggravated at the time of her resignation that a reasonable person in her position would have resigned. Fujisawa further contended there was no evidence by which Casenas could show her employer's actions were motivated by a desire to retaliate against her for filing a sexual harassment complaint. And even if she could make the requisite showing, Fujisawa's undisputed evidence established its legitimate, nonretaliatory reason for its actions and Casenas had no evidence to show the proffered explanation was pretextual.

Fujisawa's separate statement of undisputed material facts presented most of the facts recited above. In her opposing separate statement, Casenas admitted nearly all of the material facts, disputed some with facts which

---

[9]This allegation will be ignored because the record contains no reference to specific derogatory remarks made by anyone except Brown, whose comments are dealt with separately. (See fn. 18, *post.*)

were not material,[10] and objected to some as hearsay, but failed to obtain an evidentiary ruling barring them.[11] The court, finding no triable issues of fact, granted summary judgment to Fujisawa.

## II

Casenas's appeal is not about whether Brown sexually harassed her.[12] The issues pertain to the employer's activities and motivations after Casenas reported her former district manager's conduct.

A defendant moving for summary judgment "has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (o)(2).) The burden then "shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (*Ibid.*) We conduct a de novo review. (*Frank and Freedus* v. *Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 469 [52 Cal.Rptr.2d 678].)

### CONSTRUCTIVE DISCHARGE

The elements of constructive discharge are set forth by our Supreme Court in *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238 [32 Cal.Rptr.2d 223, 876 P.2d 1022], a case we find absolutely dispositive of Casenas's appeal and thus discuss in some detail.[13]

Turner worked for a brewery for six years, voluntarily resigned in 1981, and then returned in early 1984, to work at the wholesale operations division

[10]On a motion for summary judgment, "[m]ateriality depends upon the issues in the case; evidence which does not relate to a matter in issue is not material. [Citations.]" (*Monastra* v. *Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628, 1635 [51 Cal.Rptr.2d 528].)

[11]In analyzing a summary judgment motion, "[t]he court is required to consider all the evidence set forth in the papers, *except where objections are properly sustained,* and all inferences reasonably deducible from such evidence." (*Tchorbadjian* v. *Western Home Ins. Co.* (1995) 39 Cal.App.4th 1211, 1217 [46 Cal.Rptr.2d 370], italics added.)

[12]Nor is the appeal about whether any other employee found Brown's conduct offensive. For that reason, we find immaterial the factual dispute about the circumstances under which a former Fujisawa employee, Judy Doll, resigned, or about the substance of Doll's conversation with Ison at the time of her departure. Moreover, the conflict between Doll's and Ison's recollections did not impeach Ison in any material respect, that is, it did not create a triable issue of fact regarding the viability of Casenas's claim of constructive discharge. (See fn. 10, *ante.*)

[13]The parties have engaged in argument overkill, to put it mildly, citing dozens and dozens of cases which add precious little, if anything, to the discussion. *Turner* says it all; we need go no further.

as a " 'branch off-premises coordinator' in the sales department." (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1243.) In May 1985, he was "reassigned to the position of 'assistant supervisor route sales.' " (*Ibid.*) His salary and responsibility level were unchanged. For four years, with only one exception, he "received 'good' ratings on written performance evaluations." (*Ibid.*) But in December 1988, his rating was " 'needs improvement.' " (*Id.* at pp. 1243-1244.) He met with supervisors who advised him his "job performance had deteriorated." (*Id.* at p. 1244.) Turner disagreed with both the appraisal and his supervisors' handling of the matter. He resigned and sued, alleging, in pertinent part, constructive wrongful discharge in violation of public policy.[14]

The *Turner* court, reversing the Court of Appeal, found the trial court had properly granted the employer summary judgment. Initially, it noted, "Actual discharge carries significant legal consequences for employers, including possible liability for wrongful discharge. In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment." (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1244.) The court explained, "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. [Citation.]" (*Id.* at pp. 1244-1245.)

The *Turner* court then delineated "[t]hree areas of inquiry" to test whether a constructive discharge claim can be proved. (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1245.) First, there must be intolerable conditions: "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id.* at p. 1246.) In this respect, an employer is not obligated to provide a stress-free environment: " ' "An employee is protected

---

[14]Turner claimed his employer "subjected him to a 'campaign of harassment' because he complained of alleged [employer] violations of federal and state laws, internal company policies, and provisions of [the employer's] collective bargaining agreement." (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1253.) He contended retaliation was the employer's motivation for "less-than-satisfactory performance evaluations several years later, thereby causing him to quit." (*Ibid.*)

from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers." ' " (*Id.* at p. 1247.) "[A]dverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1247, fn. omitted.) " '[T]he mere failure to promote the plaintiff, even if unlawfully discriminatory, will not support a finding of constructive discharge. . . . Nor is it sufficient to show only that the employee received a poor performance rating.' . . . 'Further, demotion of job level, even when accompanied by reduction in pay, does not constitute constructive discharge.' " (*Id.* at p. 1247, fn. 4, citations omitted.)

The second inquiry under the *Turner* test applies an objective standard, asking " 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' [Citations.]" (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1248.)

The final inquiry focuses on the employer: "[T]he employee's resignation must be *employer*-coerced, not caused by the voluntary action of the employee or by conditions or matters beyond the employer's reasonable control." (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1248, original italics.) Employer coercion of a resignation against the employee's will cannot be proved by evidence of the employer's constructive knowledge of an intolerable situation. Rather, ". . . the employer must either deliberately create the intolerable working conditions that trigger the resignation or, at a minimum, must know about them and fail to remedy the situation in order to force the employee to resign." (*Id.* at pp. 1249-1250.) This standard, requiring employees to notify someone in authority about the intolerable working conditions, "permit[s] employers unaware of any wrongdoing to correct a potentially destructive situation" (*id.* at p. 1250), and "discourages employer inaction." (*Ibid.*)[15]

The *Turner* court summarized its holding: "In order to establish a constructive discharge, an employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable

---

[15]The *Turner* court also observes, "[E]ven though sexual harassment claims sometimes are considered within the context of constructive discharge allegations, the focus in a constructive discharge case is the employer's *knowledge and conduct* in forcing the employee to resign in light of the intolerable working conditions." (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1251, italics added.)

person in the employee's position would be compelled to resign." (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1251.)

■ Casenas's facts do not survive the *Turner* test. The trial court correctly determined no jury would be permitted to find Fujisawa or any of its agents coerced her resignation by intentionally creating or knowingly permitting the existence of working conditions so intolerable at the time of the resignation that a reasonable person in the same position would have no rational option except to resign.

## INTOLERABLE CONDITIONS

Little discussion is needed regarding Casenas's allegations she received an unfair performance evaluation and was not considered for promotion to a management position. As a matter of law, such events do not create intolerable working conditions transforming a voluntary resignation into constructive discharge. " ' "An employee may not be unreasonably sensitive to his [or her] working environment . . . . Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work." ' " (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1247.) For instance, ". . . a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Ibid.*, fn. omitted.)[16]

Moreover, with regard to factual evidence, while Casenas held the opinion her appraisal was unfair, she did not contradict Fujisawa's *proof* her rating and merit increase (the highest awarded in her district) were fair and reasonable based upon comparative data utilized nationwide by the company. The fact she was never told she ranked in the 55th to 60th percentile of all PSR's is immaterial. And she admitted she had no evidence or reason to believe Fujisawa's averred sales statistics were false. Moreover, Casenas's achieving 105 percent of her individual sales goal did not automatically entitle her to an "outstanding" rating. Indeed, Ison averred the rating is

---

[16]See *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390, 401 [3 Cal.Rptr.2d 6], alluding to *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743]: "Since demotion of an employee or criticism of his [or her] job performance—even if alleged to be unfair or outrageous—does not permit the employee to bypass the remedy afforded by the workers' compensation law and sue his [or her] employer for emotional distress and resultant physical disability caused by such conduct, the same conduct does not create the intolerable working conditions necessary to support a claim of constructive discharge."

reserved for the top 10 percent of PSR's nationwide; Casenas was not among that select group.[17]

Nor was there any *material* dispute about Fujisawa's reason for not considering Casenas for the position of district sales manager. Although Casenas had initially identified her goal of achieving that title, she admitted that in February 1989 (before she aired any complaint about sexual harassment), she advised Fujisawa she had chosen an entirely different career path—senior sales representative or executive representative, with the long-term goal of a specialty sales assignment. On the motion for summary judgment, she quibbled about *why* she had changed her plans, saying it was at Bernson's urging, but she offered no evidence anyone in management knew she still wanted to be a district sales manager. Nor did she controvert Fujisawa's evidence that the *only* reason she was not originally included among the candidates for the job was her own stated change of direction. Moreover, Ison declared—without contradiction—that at the infamous five-hour meeting, he and Bernson discussed with Casenas her goal of being a sales manager and the process by which such positions were filled, and promised her they would do everything in their power to help her advance to the position she coveted.

Turning to the meeting itself, which Casenas paints in such florid prose in her complaint, we note "[t]he purpose of summary judgment is to penetrate . . . adept pleading and to ascertain, by means of affidavits, the presence or absence of triable issues of fact. [Citation.]" (*Watson* v. *State of California* (1993) 21 Cal.App.4th 836, 840-841 [26 Cal.Rptr.2d 262].) Casenas presented no evidence of threats, reprimands or intimidating remarks. Indeed, Fujisawa submitted *uncontradicted* evidence the whole purpose of the meeting was to give Casenas a forum for airing all the items on her agenda, and she agrees the issues were discussed in detail. Indeed, she took eight pages of notes reflecting her active participation in a wide-ranging exchange in which all of her concerns were addressed. She complains she did not receive satisfactory answers to all of her questions, but *that* deficiency creates no triable issue as to " ' "unreasonably harsh conditions." ' " (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1247.) Rather, it reflects an ordinary, commonplace frustration inherent in the nature of employment. (*Ibid.*) And insofar as Casenas claims the *length* of the meeting presents a triable issue of fact of intimidation, to all appearances she was completely in control of the situation. The meeting ended when she "got up and walked out." There is no evidence she was prevented from doing just that at an earlier time.

---

[17]Ison further stated Casenas's sales goal for the relevant year was lower than that of all other PSR's in her district and most PSR's in the nation.

But even assuming the meeting was intimidating, as a rule, under *Turner*, " '[s]ingle, trivial, or isolated acts . . . are insufficient' to support a constructive discharge claim. [Citation.]" (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1247.)

Casenas also lists as an intolerable condition Ison's refusal to converse with her through correspondence. We fail to discern the legal significance of this assertion. Casenas opined meetings were a waste of time until issues were "clarif[ied] through clear and concise memos." Well, Ison disagreed, preferring face-to-face interaction. *He* was the boss—the legitimate arbiter of business practices. A jury would not be allowed to second-guess his management style or to infer the existence of a pernicious underlying motivation.[18]

In short, whether examined in isolation or accumulation, the facts upon which Casenas relied do not demonstrate intolerable conditions under the *Turner* test.

OBJECTIVE STANDARD

We need not dwell on the issue of " 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' [Citations.]" (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1248.) Although Casenas contends the objective standard is *necessarily* a jury question, her cited cases do not support that proposition, and, in the factual context presented here, it is patently absurd. In March 1989, Casenas was given a rating of "highly commendable," together with the highest merit increase in her district and a promotion to senior sales representative. She was praised time and time again in subsequent months, earning awards and bonuses. Fujisawa's management responded immediately to her stated dissatisfaction with her appraisal, reviewing it, making changes to accommodate her suggestions and

---

[18]Casenas further alleged "derogatory comments" made by Brown as a basis for her constructive discharge claim. On one occasion, when she failed to appear for a meeting following a weekend holiday, Brown asked her whether she was "drunk or hung over"; at another time, he was condescending, criticizing her for manipulating the internal clock of her company computer (contrary to written company policies) to show the entry of sales calls at times and dates *other than the actual times and dates on which she made the calls;* and finally, on a third occasion, Brown questioned the authenticity of a document Casenas handed him. As a matter of law, none of these comments constitute intolerable conditions such as would cause Casenas to believe she had no option but to resign from her job. Brown was her district sales manager at the relevant times: Criticism of work practices is " 'a normal part of the employment relationship.' " (*Soules* v. *Cadam, Inc., supra*, 2 Cal.App.4th at p. 401.)

directing the preparation of an addendum. The *only* thing it did not do was change the rating or the salary increase, both of which it deemed fair. There was endless consideration of her complaints and an investigation of the sexual harassment charges which resulted in a devastating written reprimand to Brown, to follow him forever in his personnel file. Casenas was congratulated and thanked for having called the matter to management's attention. There was no evidence anyone at Fujisawa ever gave Casenas any indication her job or advancement or career objectives were in jeopardy. The only reasonable inference arising from the evidence is that she had the utmost employment security, an environment tailored to meet her specific needs, and support at every level of Fujisawa's management. As a matter of law, no reasonable person in Casenas's position would have believed she or he was being forced out of the company.

## EMPLOYER'S KNOWLEDGE

As for the third element of the *Turner* test, Casenas submitted no evidence to contradict Fujisawa's showing of the diligence it exercised in timely response to and investigation of the sexual harassment allegations, its severe written and oral reprimands of Brown and warnings to him regarding any further unprofessional conduct, and its extraordinary care to ensure Casenas never had to lay eyes on him again. Fujisawa established as a matter of law it had neither deliberately created intolerable working conditions nor knowingly permitted them to exist.[19]

## CONCLUSION

We close with the sorry observation that despite its exemplary conduct, the employer here was unable to placate its dissatisfied employee and avoid a lawsuit. However, and fortunately, Fujisawa utilized the summary judgment procedure which fulfilled its laudatory purpose of expediting the

---

[19]Even if Casenas had established a triable issue of fact regarding constructive discharge, she would still have to "independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful discharge*." (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1251, original italics.) "Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing." (*Ibid.*) Assuming, solely for the sake of argument, some of the employer's conduct could be deemed *adverse* to Casenas (which is a stretch), Fujisawa articulated a legitimate, nonretaliatory explanation for its conduct and Casenas failed to show the proffered explanation was merely a pretext for illegal behavior. (See *Flait* v. *North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522].) Additionally, we find no triable issue regarding a nexus between Casenas's reporting of Brown's sexual harassment in March 1989 and the employer's subsequent actions.

litigation and eliminating the further waste of time and money which would have resulted from an utterly needless trial. (See, e.g., *PMC, Inc.* v. *Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 590 [52 Cal.Rptr.2d 877].) As other courts have aptly observed, " '[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one.' " (*Frank and Freedus* v. *Allstate Ins. Co., supra,* 45 Cal.App.4th at p. 469, citing *Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 507 [86 Cal.Rptr. 744].)

The judgment is affirmed. Fujisawa shall recover its costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.