[No. G018307. Fourth Dist., Div. Three. Feb. 19, 1999.]

SHARON BIERBOWER, Plaintiff and Appellant, v.
FHP, INC., Defendant and Respondent.

**COUNSEL**

Chandler & Vatave, Linda Hart Chandler and Sunil Lewis Vatave for Plaintiff and Appellant.

Heller, Ehrman, White & McAuliffe, Deborah C. Saxe, David B. Fischer; Jones, Day, Reavis & Pogue and Miwon Yi for Defendant and Respondent.

## OPINION

**SILLS, P. J.**—You cannot make a mountain out of a typo. Nor can you, at least in this case, make a defamation suit. **(1a)** Today we hold that a discrepancy in an office memo concerning the date on which an alleged incident of sexual harassment took place is insufficient evidence of malice for purposes of whether a company investigation of the alleged harassment is protected by the "common interest" privilege against defamatory communications. (See Civ. Code, § 47, subd. (c).)

I

■ Civil Code section 47, subdivision (c) extends a conditional privilege against defamation to communications made *without malice* on subjects of mutual interest. (Civ. Code, § 47, subd. (c) ["A privileged publication . . . is one made: [¶] . . . [¶] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested . . . ."].)

A number of cases have now established that this "mutual interest" privilege covers investigations of sexual harassment complaints by private employers when made without malice. (See *Cruey* v. *Gannett Co.* (1998) 64 Cal.App.4th 356, 369 [76 Cal.Rptr.2d 670] ["The conditional privilege set out in subdivision (c) of section 47 potentially applies in the present case because Lacy's letter of complaint to Gannett pertains to a subject of mutual interest to Gannett and its employees, an accusation of workplace harassment and discrimination."]; *Garziano* v. *E. I. Du Pont De Nemours & Co.* (5th Cir. 1987) 818 F.2d 380, 387 [intracompany memo protected by qualified common interest privilege under Mississippi law]; *Stockley* v. *AT & T Information Systems, Inc.* (E.D.N.Y. 1988) 687 F.Supp. 764, 768 [applying common interest privilege under New York law to investigation into sexual harassment allegations]; *Lawson* v. *Boeing Co.* (1990) 58 Wn.App. 261 [792 P.2d 545, 549] [citing *Stockley*]; see also *Vackar* v. *Package Mach. Co.* (N.D.Cal. 1993) 841 F.Supp. 310, 313-314 [assuming privilege applied where argument was over whether malice provision applied].)

There is no reason to doubt the validity of these courts' conclusions. As indicated by the groundbreaking case on the point, *Garziano* v. *E. I. Du Pont De Nemours & Co., supra,* 818 F.2d 380, employers and employees both have a common interest in preventing and correcting sexual harassment. To that we would add—to put the matter in practical terms—that because any given interaction between any two people at the same workplace carries at least the *danger* of a sexual harassment lawsuit, the matter is necessarily of "mutual interest" under Civil Code section 47, subdivision (c). Any other

conclusion would fly in the face of workplace reality as it has been shaped by sexual harassment law.

The usual battleground in cases where an employee sues an employer claiming that he or she was falsely accused of sexual harassment is—as it is in the present appeal—whether the employer's communications were made with malice so as to deprive the employer of the conditional privilege. (E.g., *Stockley* v. *AT & T Information Systems, Inc., supra*, 687 F.Supp. at p. 770 ["Plaintiff essentially concedes the existence of a qualified privilege, but argues that allegedly defamatory statements were made outside the scope of the privilege and with actual malice."].)

The present case involves a defamation action by Sharon Bierbower, a sales representative, against her former employer, FHP, a health care provider, arising out of a complaint made against her by a receptionist, Pauline Ayala. It is undisputed that on a day in late August 1992 (the exact date *is* disputed, as will soon be shown), Ayala complained about several incidents of alleged sexual harassment, including one incident that happened that very day.[1] She went to Bruce Huyghue, a senior plan manager at FHP. It is also undisputed that on that day she was upset (she testified she was crying, Huyghue testified she was upset but couldn't remember if she was crying), and related one of the incidents, which allegedly happened in the reception area. She also stated that she just wanted to make Bierbower "go away" and would file a formal complaint if Bierbower ever "approached her again in a suggestive manner."

Huyghue was familiar with FHP's anti-sexual harassment policy. As he understood company policy, he was *required* to "document" incidents of sexual harassment and report them to the company's personnel department even if the complainant did not want any action taken.

Huyghue typed up a memo concerning what Ayala had said to him within five minutes. The memo recited that he spoke with Ayala on August 26, but was dated August 27, and related the three incidents we have mentioned

---

[1]The alleged incidents included one time when Bierbower stopped her car in front of Ayala in the company parking lot, asked her where she was going and said she wanted to be "friends"; one incident where Bierbower stuck out her butt at Ayala, rubbed it and licked her own lips; and one incident where Bierbower first asked to eat a baby plum that Ayala already had in her mouth, then exposed part of her breast, including a little bit of nipple, to Ayala, fondled it in front of her, and then left after making a crude remark. The plum and breast exposure incident was the one which happened the very day of the complaint.

above. It also related the fact that Ayala wanted to file a "formal complaint" if Bierbower ever approached her in a "suggestive manner" again.[2]

Later that same day Huyghue spoke with Connie Walters, Bierbower's supervisor, about it. Walters told Huyghue that Bierbower was on vacation.

Now here is where the discrepancy in the dates becomes important in this appeal. Huyghue's memo was *dated* August 27, 1992, but the first paragraph recites that "I spoke with Pauline on August 26." But it is also undisputed that on August *26* Bierbower was in Las Vegas on her vacation. According to Bierbower, because the conversation between Huyghue and Ayala took place on a date on which Huyghue knew Bierbower was on vacation, yet concerned an incident which took place on that very date, Huyghue necessarily must have known that Ayala's accusations were false (cf. *Lawson* v. *Boeing Co., supra*, 792 P.2d at p. 549 ["If their allegations were false, they were unquestionably knowingly false."]). For Bierbower, the fact Huyghue later circulated the memo to the personnel department necessarily demonstrates that he acted with malice because the memo contained what he knew was a false accusation.

---

[2]Here is the complete text of the memo, in as close as we can approximate to its original typographical format:

"Date: August 27, 1992

"To: File

"From: W. Bruce Huyghue

"Subject: Pauline Ayala Sexual Harassment Complaint

"I spoke with Pauline on August 26, 1992 regarding her complaint about the recent actions of Sharon Bierbower.

"Pauline stated that she is offended by the sexually explicit actions and remarks Sharon has made towards her.

"According to Pauline, Sharon has expressed a desire to 'become friends' with her on several occasions. According to Pauline:

"Sharon has approached Pauline in the parking lot after work and 'tried to come on to her.' She felt that the looks and comments Sharon gave her were intended to arouse a romantic interest

"Sharon asked Pauline for a plum. Pauline answered that she was already eating the only plum she had. Sharon asked her to give her a piece of what was then in her mouth.

"Sharon entered the lobby when Pauline was at the switchboard and began talking to Pauline in a suggestive manner. Pauline asked her to get away from her. Sharon partially exposed and fondled her own breast while looking directly at Pauline. Sharon made a lewd comment and left.

"Pauline feels that the other female employees find it funny and embarrassing that Sharon displays such obvious sexual interest in Pauline who is also female.

"Pauline is aware of her right to file a complaint. She asked me to make Sharon just go away, since the Consultant group is being disbanded. She stated that she would definitely want to file a formal complaint if Sharon ever approached her again in a suggestive manner.

"I told her that I would discuss the situation with other appropriate management people and take what ever disciplinary action company policy might require."

For his part, Huyghue testified that he wrote the memo on *August 27*, because the date was automatically supplied by his computer, and the recitation that he spoke with Ayala on August 26 was simply a mistake. Ayala, on the other hand, testified that she could not remember "the exact date," and said it was *either* the 26th or the 27th, but in any event it was the day she went to Huyghue. She did, however, admit that at her deposition she testified that the date was the 26th.

Despite the discrepancy over the date of Ayala's talk with Huyghue, the trial court judge granted a motion for nonsuit after Bierbower had rested her case when her defamation suit against FHP came to trial in May 1995. The judge concluded that Bierbower had failed to present any substantial evidence of malice on the part of FHP. From the ensuing judgment Bierbower has brought this appeal.

## II

Naturally, given the procedural posture of the appeal, Bierbower reminds us that the standard of review of a judgment based on a motion for nonsuit runs in her favor. She is entitled to the benefit of any conflict in the evidence and any reasonable inference that might be drawn from it. Even so, we cannot say the trial court erred. A number of reasons based on the undisputed facts require this conclusion.

First, Huyghue's marching orders when faced with sexual harassment allegations were to document and report, not to evaluate. His testimony was unequivocal that his job was to document and report, not investigate. The question of *whether* Bierbower might have been falsely accused was not for him to decide. In that regard, we can hardly say that an employer acts maliciously in requiring supervisorial employees who may have no formal training in factual investigation to document and report sexual harassment claims without first having to ascertain the validity of those complaints. FHP's policy is easily justified as a matter of reasonable employer prudence. (See *Cotran* v. *Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 106-107 [69 Cal.Rptr.2d 900, 948 P.2d 412].) As our Supreme Court has recently observed, sexual harassment investigations may implicate "intractable factual uncertainties." (*Id.* at p. 106.)[3] Given the difficulty faced by the employer in the face of a sexual harassment allegation, an employer certainly acts reasonably by having a mechanism for forwarding complaints on

---

[3]A point with which Justice Kennard *agreed* in her concurring and dissenting opinion. (See 17th Cal.4th at p. 117 (conc. & dis. opn. of Kennard, J.) ["resolution of close factual questions involving difficult evaluations of witness credibility and hard choices among conflicting inferences"].)

for an investigation even where there is something suspicious about the complaint. To hold an employer liable for defamation because one employee must pass on a defamatory allegation of sexual harassment to another for investigation flies in the face of all sexual harassment law. The idea that the formal investigation should be conducted by a firm's human relations or personnel departments rather than the supervisor who first receives the complaint is an eminently reasonable one, if only because it promotes neutrality in any investigation. (See Lederman, *Investigating Sexual Harassment* (Nov. 1998) 18 Cal.Law. 73, 75 [recommending that investigation be conducted by employer's human relations department, or other neutral entity]; cf. *Casenas v. Fujisawa USA, Inc.* (1997) 58 Cal.App.4th 101 [67 Cal.Rptr.2d 827] [memo to regional sales manager containing sexual harassment complaint prompted timely investigation by both regional sales manager and company personnel manager; firm's response described by court as "exemplary"].)[4]

Two, the allegedly defamatory memo set forth *three* complaints from Ayala, not just the one that happened on the date Ayala spoke with Huyghue. This fact demonstrates that Huyghue's state of mind in writing the memo was to document and report Ayala's complaint, not investigate the bona fides of the one incident that allegedly happened on the day the memo was written. (Cf. generally, *Cotran v. Rollins Hudig Hall Internat., Inc., supra*, 17 Cal.4th at p. 107 [emphasizing employer's state of mind in distinction to whether employee did "in fact" commit dischargeable act as criterion for whether there was good cause to discharge].) As such, actual falsity was irrelevant from the point of view of Huyghue's duties in the overall scheme of FHP's anti-sexual harassment policy, and therefore the fact that the date might have belied Ayala's story is also irrelevant. Huyghue's role was

---

[4]As our Supreme Court observed in *Cotran* in the context of whether a dismissal contravened an implied agreement not to discharge except for good cause, the proper inquiry is whether the employer's decision that a "dischargeable act had been committed" had been "reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual." (*Cotran v. Rollins Hudig Hall Internat., Inc., supra*, 17 Cal.4th at p. 107.) It is thus almost impossible to see how any one could take issue with a company policy that required all sexual harassment complaints to be forwarded for "appropriate investigation," and did not risk allowing the complaint to fall through the cracks by giving the supervisorial employee discretion to pocket veto any complaint if he or she concluded it was unfounded. Such a policy further promotes neutrality in the investigation. On the other hand, as *Casenas* teaches us, an employer who does allow a supervisor who receives a complaint to participate in its investigation can hardly be faulted either. In *Casenas* we gave the employer an "A" grade for an "exemplary" investigation. (See *Casenas v. Fujisawa USA, Inc., supra*, 58 Cal.App.4th at p. 118.) Whether FHP here should get an "A" for its rigid requirement that all complaints be passed on to personnel (which assures neutrality), or merely a "B-" because the same policy allows possibly meritless complaints to make their way higher up the corporate hierarchy than might otherwise be the case, is a matter on which reasonable minds can disagree. Both approaches, however, obviously pass the course.

simply to pass on information as part of an *overall* anti-sexual harassment policy, not adjudicate the bona fides of any given claim.

Three, when the allegedly defamatory memo is read as a whole and in the context of the undisputed fact that Ayala was at least "upset" (if not in tears) when she came to see Huyghue, it would be totally unreasonable to conclude that Huyghue harbored any malice in writing it. There is a complete absence in the text of the memo—with the arguable exception of the discrepancy in the dates—of anything that would even begin to give rise to an inference that Ayala's complaint was false. The memo recites that Ayala just wanted Bierbower to "go away" and only planned to file a "formal complaint" after the *next* incident of alleged harassment. That is hardly what one would expect from someone who was contriving an obviously false story against a coworker who supposedly was several hundred miles away at the time. The facts that Ayala only wanted to have Bierbower kept away from her and would only file a formal complaint if another incident took place would naturally lead someone in Huyghue's position to believe that Ayala was not fabricating her complaint.

Finally, with regard to the discrepancy in the dates, Huyghue's testimony that his computer supplied the right date and he simply got the date wrong is without any basis for contradiction. As anyone who has ever written a check in January dated the previous year knows, human beings often make mistakes with exact dates.[5] It is unreasonable to ascribe to a malevolent conspiracy that which is easily, naturally and *ordinarily* explained by a common human error. "Things happen," as one of the wisest portions of the Civil Code reminds us, "according to the ordinary *course of nature* and the ordinary habits of life." (Civ. Code, § 3546.) Given the totality of evidence in this case, no reasonable jury could have found malice on FHP's part in this case.

Unlike *Cruey* v. *Gannett Co., supra*, 64 Cal.App.4th 356, this case does not involve the issue of whether there was any evidence that a complaining *coworker* may have acted with malice in making a false sexual harassment complaint. (Cf. *Cruey, supra*, 64 Cal.App.4th at pp. 369-370 [statement by coworker that she "knew how to protect her job" held sufficient to allow malice issue to go to jury].) This case, rather, is more like *Garziano* v. *E. I. Du Pont De Nemours & Co., supra*, 818 F.2d at pages 390-391 and *Vackar* v.

---

[5]There is no reasonable inference that can be drawn in Bierbower's favor from the fact that one date was typed in and the other generated automatically by the computer. If an inference had to be drawn, it is that the date Huyghue typed in was the incorrect one, because—however maddening computers and their software programs can sometimes be—they usually have the right date and approximately the right time.

*Package Mach. Co., supra,* 841 F.Supp. at pages 314-315, where the allegedly defamed coworker unsuccessfully argued that malice could be inferred from the fact that the employer could have done a better job of investigating the sexual harassment complaint.

The point is, of course, that maliciousness cannot be derived from negligence. Malice entails more than sloppiness or, as in this case, an easily explained typo. To make more of it borders on pettifoggery (literally, to wrangle or quibble about petty points). (See 11 Oxford English Dict. (1989) p. 643.) The judgment is affirmed.

Wallin, J., and Sonenshine, J., concurred.

A petition for a rehearing was denied March 22, 1999, and appellant's petition for review by the Supreme Court was denied May 12, 1999.