Filed 4/28/22  Burroughs v. Truebeck Construction CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JAMES BURROUGHS,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>TRUEBECK CONSTRUCTION, INC.,<br><br>　　　Defendant and Respondent. | A161595<br><br>(San Mateo County<br>Super. Ct. No. 19CIV03495) |

Plaintiff James Burroughs was the Director of Health and Safety employed by defendant Truebeck Construction, Inc. (Truebeck), a San Mateo County-based construction company.  Burroughs alleges that after he reported to company management his discovery that an employee had falsified a safety training record, he was subjected to increasingly hostile treatment in the workplace that ultimately forced him to quit his job when the situation became intolerable.  Burroughs initiated this suit against his former employer for various statutory and common law claims of retaliation and wrongful constructive discharge, and ultimately the trial court granted summary judgment against him.  He now appeals, arguing that various triable issues of fact warrant a trial on all of his causes of action.  We reject his contentions and affirm the judgment.

1

## BACKGROUND

"Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

Truebeck is a company based in San Mateo County that provides general contractor services for large-scale commercial construction projects. Burroughs began working there in 2008, as its Director of Health and Safety. In that role, he was responsible for overseeing the company's compliance with safety guidelines and standards applicable to the construction industry.

### A. The Investigation into a Falsified Training Certificate

On December 21, 2017, nearly 10 years into Burroughs' tenure with the company, an audit of safety training records performed by a company intern revealed that one of the company's foremen had not completed a safety training program required every five years for all supervisory employees of the company who work on construction jobsites. That program, a 30-hour safety training course called OSHA 30, is not required by law. The company voluntarily adopted the training requirement as part of its own safety policies and procedures. The company offered the training through a third-party provider called ClickSafety, which offered online training.

The day the discrepancy came to light, the foreman was emailed by the intern and asked if he had taken the training in the last five years and, if so,

2

to submit proof that he had done so or else the company would make arrangements to get him the training. He responded in an email by claiming he had taken the required training the prior year, and he attached as proof a certificate of completion for the training course that appeared to be falsified, as if his name had been pasted over somebody else's name. At some point in this timeframe, Burroughs learned the apparently falsified certificate was hanging in the foreman's office in a trailer at one of the company's job sites.

Eleven days later, on January 1, 2018, Burroughs sent an email to company management alerting the executives that the foreman had falsified his certificate of OSHA 30 training. This was the report that would later become the basis for his retaliation claims.

The January 1, 2018 email, captioned "Important Training Concern/Issue – Please Read," was sent to the company's two principals and cofounders (Dave Becker and Sean Truesdale), its General Superintendent (Jeff Faulkner) and Burroughs' own supervisor, Senior Vice President of Operations Mike Anderson. In it, Burroughs reported about the intern's discovery and the foreman's response with the suspicious certificate of completion; that, "[a]fter further research" by someone not identified, the information reflected on the certificate of completion (its uniquely assigned serial number, and details reported about the date and duration of the training) was found to match that of a different employee; and that the "issue" had been brought to his (Burroughs') attention "just before Christmas," following which he looked into the matter and discovered there was no record in the company's ClickSafety account of the foreman having been assigned the training[1] and no record of the foreman having completed

---

[1] Burroughs would later come to learn that the foreman might possibly have been assigned the online training in May 2016, but that, due to an

3

the course through another employer or entity. Burroughs reported in the email that he had not discussed the situation with either the foreman or "Fitzpatrick"[2] but asserted, "I am, however, aware that there are others who know that this issue arose on or about 12/22; and that various opinions may have been expressed already."

Burroughs' email to his superiors then relayed five "opinions/concerns" about the situation:

"1.     The safety team (dept.) has been working very hard on the 'training' aspect of our over-all function to help Truebeck build a real safety culture. When we see something that appears to be a deliberate falsification of required training, it is extremely frustrating.

"2.     If this is indeed a deliberate attempt to circumvent one of our core training requirements, then it is most certainly a 'slap-in-the-face' to one of the organization's core marketing/recruiting mantras, 'Don't do what's easy—Do what's Right.' As well as Sean's remarks in our New Safety Orientation Video regarding how much 'time is spent focusing on [safety] training[.]'

"3.     The OSHA 30-Hour Out-Reach Training Program is a Federal Department of Labor program which is closely regulated and monitored. Our fairly recent foray into OSHA's Voluntary Protection Program (both a state and federal program) leaves me a bit concerned as we have presented our training programs to OSHA. Unlikely, but certainly possible that training records submitted on behalf of supervision for our current application for

inexplicable "irregularity" in ClickSafety's system, the company was unable to see that assignment when viewing the foreman's training record from the company's ClickSafety account.

[2] The identity of that person is unclear from the parties' briefs.

4

VPP status at the Mission Bay project might not withstand intense scrutiny and the process could be jeopardized. And, our existing Apple status could also be at risk.

"4. If the info presented above is what it appears to be, then I would also question whether or not others were involved or knew. We will be looking at other on-line training docs/records for irregularities.

"5. The real-effect of a front-line field supervisor, such as a labor foreman, not participating in extremely relevant, crucial construction safety training is very dangerous—because he/she is making decisions and directing others whose safety may be at greater risk for that non-participation."

A week later, on January 8, Burroughs brought up the matter in a regularly scheduled meeting with the company's General Superintendent Faulkner and Burroughs' supervisor, Anderson. By then, Burroughs had discovered that the Director of Human Resources, Rosanne Smith-Kaya, had directed Burroughs' assistant (Justin Harvey) to shred the falsified certificate.

Burroughs told Faulkner and Anderson in the January 8 meeting that he believed the foreman needed to get the training right away, and so his supervisor, Anderson, directed Burroughs to enroll the foreman in a training class immediately. At some point in the same timeframe (early January), the company's HR Director, Kaya, also directed Burroughs to do that.

The foreman would eventually complete a live OSHA 30 training course the following month (on February 8, 2018), but he did not get enrolled immediately because, for the next several weeks, the foreman's supervisor, Ross Bottarini, argued with Burroughs about whether the foreman had already completed the safety training. In their first email exchange, which was precipitated by Burroughs' efforts to schedule the training as directed,

5

Bottarini questioned why the foreman needed more training, and he told Burroughs "I sat with [the foreman] while he worked in [*sic*] this while our project was slow. Have you checked with ClickSafety? I have been in touch with them and they told me that nobody from [the company] has reached out to them other than myself." Burroughs thought Bottarini's claim that he (Bottarini) had "sat" with the foreman while the foreman "worked" on the course was untrue. Burroughs asked Bottarini *when* it was that Bottarini saw the foreman take the training, and also *what* Bottarini had discussed with ClickSafety, whom he had spoken with and what he had been told by ClickSafety, and Bottarini would not respond to any of his questions. Burroughs also believed Bottarini lied in subsequent back-and-forth communications when he told Burroughs the foreman had "completed his OSHA 30 through ClickSafety" and that it "was assigned by the Safety Department."[3]

During this timeframe (January 2018), Burroughs felt increasingly frustrated and concerned. He complained to some of his colleagues about the interference he felt he was encountering from Bottarini, was very worried that a jobsite accident could expose the company to potential civil and criminal liability, and believed the company was intentionally ignoring the fact that a training certificate had been falsified and that the "fraud" was

---

[3] There was conflicting evidence, introduced by defendant, as to whether Bottarini genuinely believed the foreman might already have completed the training. Nevertheless, it is undisputed that Bottarini said he had contacted ClickSafety himself to verify the foreman's training records, and that when ClickSafety was unable to verify the records, the foreman was scheduled for live training.

6

being covered up. He continually voiced his concerns to company management, both in meetings and in writing.

For example, in a January 17 email to Bottarini's boss, Jeff Faulkner, Burroughs voiced concerns about the company's potential civil and criminal liability if an accident with serious injury were to occur , as well as concerns that Bottarini had been lying to him, and that HR Director Kaya had shredded the false certificate and made a comment that she "had spoken with the 'guys up there,' and 'couldn't prove' who had altered the certificate."

He raised similar concerns in a heated January 25 email to the company's top management. That email, moreover, opened by insisting "we just all cut through all the bull-shit on this issue," and concluded by advising his superiors that he was personally enrolling the foreman in the upcoming safety training course scheduled to begin on February 5 and "I'm expecting full support that he will be in attendance without further excuse or delay."

After receiving Burroughs' January 25 email, the company's two owners, Becker and Truesdale, asked HR Director Kaya to investigate why the foreman had not been immediately signed up for the OSHA 30 training once Burroughs had reported the foreman hadn't yet completed it.

The next day, January 26, Burroughs attended a group meeting about the situation, where he was treated discourteously and thought Bottarini continued to lie. In attendance, in addition to himself and Bottarini, were four others: his own supervisor, Anderson; Bottarini's supervisor, Faulkner; Vice President of Operations, Mike Jackson; and HR Director Kaya. At one point Burroughs tried to interject when someone was discussing a timeline of the relevant events, and his supervisor, Anderson, told him to "shut up." At another juncture, Jackson yelled at him, saying, "How dare you accuse a 12-year employee of fraud?" and suggested that someone in Burroughs' own

7

department had created the falsified training certificate. At another point, Bottarini's supervisor, Faulkner, yelled at him, interrupted him and said, "No, you listen." During the meeting, Bottarini denied knowing anything about the false OSHA training certificate or its origin, which Burroughs thought was a lie.

The outcome of the January 26 meeting, memorialized in a subsequent email by Burroughs' supervisor Anderson, was that the foreman would be immediately enrolled in a live OSHA 30 class and also four measures in response to the situation would be implemented: (i) the Safety Department would perform an audit of employee safety and training, and submit the audit results to Anderson and Faulkner; (ii) after the audit, Anderson and Faulkner would set reasonable due dates for each employee's training; (iii) the failure to complete such training would be managed as a performance issue; and (iv) the HR and Safety Departments would develop a process to ensure proper and timely training for all new employees within 90 days.

Thereafter, HR Director Kaya completed the investigation she had been charged with undertaking. She ascertained the foreman had in fact completed OSHA 30 training in September 2012, which meant he was required by company policy to re-take the training by September 2017. She also learned that the Safety Department had signed him up to take the training (online, through ClickSafety) in March 2016, and he had been assigned a course through ClickSafety on June 30, 2016. About a week later, on July 5, 2016, the foreman had been sent instructions for accessing and signing into the online course. But the online provider deleted the 30-hour course before the foreman completed it, and so by the time the issue surfaced about a year and a half later in December 2017, he had not completed the required training. Kaya also concluded that the Safety Department was

8

disorganized and lacked adequate procedures to track employee safety certifications and timely enroll people in required trainings.

On February 6, 2018, after the HR Department's investigation was complete, Kaya and Burroughs' supervisor Anderson wrote a letter to Burroughs (signed by Anderson) informing him the company had concluded its investigation. They informed him that the certificate "more likely than not, appears to be altered," and of the results of their efforts to ascertain whether ClickSafety's records could confirm whether the foreman had completed his training.

It is undisputed that the falsified training certificate was never provided to anyone outside the company, including OSHA, and that Burroughs knew this.

### B. The Investigation's Aftermath

Burroughs was dissatisfied. He remained genuinely concerned about the foreman's falsified certificate, which he felt was an issue that the company never resolved. He also felt he had been shut out of following up on the matter.

In July 2018, about five months after receiving the company's letter closing the investigation, Burroughs felt retaliated against when his supervisor (Anderson) and the company's director of marketing (Tiffany Avila) directed him to present the company's annual "Safety Excellence Award" at the annual company meeting to Bottarini. Burroughs felt blindsided by this, because he had known nothing about it and was just told he had to do it, his safety team had no input into the decision and didn't agree with it, and he was given two or three days' notice to present the award whereas in prior years the company had utilized a formal nomination process. Burroughs didn't agree with Bottarini getting the award, because he

9

thought Bottarini had lied about the foreman's OSHA 30 training. When he asked why Bottarini was getting the award, he was told it was because Bottarini had "come up with" a safety program called STOP, which was untrue because the program had been in place when Burroughs joined the company in 2008 and Bottarini had only resurrected it. Anderson and Avila also did not want to tell Burroughs who had proposed Bottarini as the award's recipient. Burroughs regarded the situation as a "complete farce" and felt "kind of sick to my stomach about the whole thing," and so did his assistant Justin Harvey, who made a comment that "[i]t completely sends the wrong message to the company." But Burroughs carried through and presented the award as directed, and afterwards two people "razzed" him about it (one of them quipping, "That will teach you to mess with Ross [Bottarini]").

Months later, still unhappy, Burroughs set up a meeting with co-owner Becker, which took place on December 5, about 10 months after the company's letter closing the investigation. Burroughs raised a number of concerns in the meeting, including that the company did not want to hear about safety compliance issues, he didn't agree with how the investigation had been handled, and he didn't feel the issue had been fully resolved. He also raised a concern that the company had not given him an annual performance evaluation for two years. The meeting lasted about 40 minutes, and Becker scheduled a follow-up meeting with Burroughs. Afterwards, from the way Burroughs had comported himself, his demeanor and the fact he had come prepared with "stacks of papers and binders," Becker began to feel that Burroughs was trying to set up a claim against the company.

Two days later, on December 7, someone reported to HR Director Kaya that a female employee had complained about an interaction with Burroughs

10

that was "awkward" and "inappropriate."  Burroughs was reported as having asked the woman how long she had been dating her boyfriend and saying, "When you started here, I thought, 'hey[,]' but now that I know you have a boyfriend we can just be friends."  Kaya spoke to the woman, who reported the comment felt inappropriate and made her feel uncomfortable.

On December 12, co-owner Truesdale and another executive, Nick Pera, met with Burroughs about the woman's complaint.  Burroughs also was informed that Pera, who had been newly promoted, had been re-assigned as Burroughs' direct supervisor in place of Anderson.

The next day, December 13, Burroughs received a written warning about the incident.  In an email, co-owner Truesdale reminded him that unwelcome behavior is prohibited and that the company is committed to a workplace free of harassment and told him that further inappropriate conduct "may lead to disciplinary action up to and including termination."

### C. Burroughs' Resignation

Nearly three months passed without incident.  Then, in early March 2019, matters deteriorated quickly.

On March 8, 2019, Burroughs attended an executive meeting at which his former supervisor, Anderson, made a joke about "ED" (erectile dysfunction).  Other people joined in the laughing and joking, including co-owner Truesdale and HR Director Kaya.  The joke did not refer to anyone specifically, and Anderson thought he was poking fun at himself (because erectile dysfunction is a condition that affects older men, and Anderson was the oldest person in the meeting).  Unbeknownst to Anderson, though, erectile dysfunction is a common side effect of prostate cancer treatment.  And it was common knowledge to those in the meeting, including Anderson, that Burroughs had previously been diagnosed with, and undergone

11

treatment for, prostate cancer. So Burroughs thought the joke was directed at him.

It was not the first time Burroughs had heard someone make "ED" jokes, but he had never complained about such jokes in the past. This time, though, he felt extremely uncomfortable because everyone was laughing, and he also felt there was a double-standard concerning inappropriate behavior, because he himself had been disciplined a few months earlier for something he thought was far less offensive. So he sent a text to Kaya during the meeting stating: "I've had prostate cancer. Inappropriate joking, don't you think?" About two and a half hours later (at 12:23 p.m.), she replied: "I'm sorry that hit a nerve with you. I was going to say something to them because although Anderson was making fun of himself and of his own age I don't want age jokes going around at meetings."

About an hour later (at 1:35 p.m.), co-owner Becker inadvertently sent a text message to Burroughs, stating: "Jim may be trying to add to his arsenal to set up a claim or something . . . I think we need to be very proactive in squashing his latest concern." A few minutes later, Becker sent another text to Burroughs, stating "Jim [Burroughs]—Sorry, this was meant for Rosanne [Kaya] and Nick [Pera]."

Becker, who already had the impression after his December 2018 meeting with Burroughs that Burroughs was trying to set up a claim against the company, testified in deposition he sent the text because he had been told that the "ED" joke offended Burroughs and he wanted Pera and Kaya to address the issue immediately and not let it linger. He denied having any intention of firing Burroughs or that Burroughs was in any danger of getting fired.

12

Burroughs, however, was very upset by the text and, given everything that had transpired, he thought the company intended to fire him and was just trying to find a way to do so. He felt sick to his stomach, extremely panicked and scared. At about 3:19 p.m. as he was driving home, he received a text from his supervisor, Pera, asking him to meet to discuss his concerns. Burroughs responded by telling Pera he was almost home, and then Burroughs called his attorney. Meanwhile, Pera sent an email to Anderson and several other people instructing them to refrain from making erectile dysfunction jokes in the workplace.[4]

Burroughs never returned to work. He took paid time off for the next week, and on March 18, 2019, 10 days after the accidental text, his attorney sent the company a letter of resignation on his behalf.

**D. Proceedings Below**

In June 2019, a few month after resigning, Burroughs initiated this lawsuit. He asserted eight causes of action against the company, but dismissed two after the summary judgment motion at issue here was filed (for intentional infliction of emotional distress and negligent infliction of emotional distress), thus leaving six operative causes of action.[5] The first

---

[4] Captioned "PX Meeting—Be Sensitive To Others," Pera's email read in full: "Hi Guys, [¶] Just wanted to remind all of us, me included, that we need to be sensitive of other people's feelings in the [*sic*] all the meetings we lead. Comments regarding sensitive issues such as Erectile Dysfunction 'ED' may hurt others and may hit to[o] close to home. I know we were trying to make playful fun of our Emergency Department 'ED' project but as with most jokes there can be a non-intentional hurtful side. [¶] If this happens in the future please be the first to squash this type of behavior. [¶] Thanks. [¶] Nick."

[5] Burroughs also named eight individual defendants (co-owners Becker and Truesdale, his supervisor Pera, his former supervisor Anderson, HR Director Kaya, as well as Bottarini, Bottarini's supervisor Faulkner and Vice

13

was a cause of action for "wrongful constructive termination in violation of public policy," alleging he had been constructively discharged in violation of "the fundamental public policies . . . as set forth in §§ 12900 et seq. of the Government Code (FEHA) and [the] California Constitution which mandates that employees be free from unlawful discrimination, harassment, and retaliation." The second was for retaliation in violation of Labor Code section 1102.5, alleging that he reasonably believed the company was violating (unspecified) state and federal laws and was retaliated against after reporting those violations by getting harassed and constructively discharged. The third was for retaliation in violation of the Fair Employment and Housing Act, alleging the company took adverse employment action against him "in retaliation for 'whistleblowing' the fraudulent activities taking place with the knowledge and ratification of Defendants, protesting discrimination and harassment, and a hostile work environment," in violation of Government Code section 12900 et seq. The fourth was for violation of Labor Code section 6310, alleging he was constructively discharged after complaining of "unsafe practices, and potentially criminal repercussions, involving the fraudulent and illegal activity regarding [the] false certification of safety training certificates." The fifth was for "hostile work environment in violation of the Fair Employment and Housing Act," alleging he had been subjected to "harassment based on his whistleblowing of illegal and/or fraudulent activity" concerning the "falsified safety training" of Truebeck's employees. The harassment he alleged, specifically, was that he had been "subject[ed] to intimidation and bullying at meetings, having to listen to jokes

_____

President of Operations Jackson), but he voluntarily dismissed his claims against them after they filed a motion for summary judgment to which he did not respond.

14

about erectile dysfunction at meetings, targeted for discipline, and refusing [*sic*] to perform yearly performance evaluations despite repeated requests." And the sixth was for failure to prevent discrimination, retaliation and harassment in violation of Government Code section 12940, subdivision (k), alleging the company failed to take all reasonable steps to prevent him from being retaliated against after he investigated the fraudulent safety training certification.

The company, as noted, moved for summary judgment on all causes of action and, in the alternative, for summary adjudication of each cause of action and Burroughs' claim for punitive damages.

After full briefing and a hearing, the trial court granted summary judgment against Burroughs, in a five-page written ruling.  It ruled as a matter of law that Burroughs had not been discharged in violation of public policy because he had not been constructively discharged; it rejected his three statutory retaliation claims (under Labor Code section 1102.5, FEHA and Labor Code section 6310) on the ground that he had not been subjected to any adverse employment action as a result of his complaints about the false OSHA 30 certification or his complaint about the erectile dysfunction joke;  it rejected his cause of action for hostile work environment in violation of FEHA on the grounds that the harassing conduct was not based on his membership in any protected class, nor was it severe or pervasive enough to be actionable; and because there was no unlawful harassment or discrimination, it rejected his cause of action for failure to prevent discrimination, harassment or retaliation.

Judgment was entered in the company's favor, and this timely appeal followed.

## DISCUSSION

## I.

### *Constructive Discharge in Violation of Public Policy*

"[A]n employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision." (*Turner v. Anheuser–Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 (*Turner*).) "An actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee." (*Turner*, at p. 1252.) Here, Burroughs argues that the evidence raised triable issues of fact as to whether he was constructively discharged in violation of public policy. We conclude the trial court properly adjudicated this cause of action against him as a matter of law. Assuming without deciding Burroughs has identified a violation of law that implicates fundamental public policies, he fails to demonstrate a triable issue of fact as to whether he was constructively discharged.

"[A]n employee cannot simply 'quit and sue,' claiming he or she was constructively discharged." (*Turner, supra,* 7 Cal.4th at p. 1246.) "In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner*, at p. 1251.)

The standard is a high one. "In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner, supra,* 7 Cal.4th at p. 1247.) In general, " 'single,

16

trivial, or isolated acts of [misconduct]' " are insufficient to constitute constructive discharge, as are "a poor performance rating or a demotion, even when accompanied by a reduction in pay." (*Ibid.*) " '[T]he adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions.' " (*Ibid.*) That is, judged by an objective standard, " 'a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' " (*Id.* at p. 1248.) "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." (*Id.* at p. 1246.) "The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Ibid.*) " ' "Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers. He [or she] is not, however, guaranteed a working environment free of stress." ' " (*Id.* at p. 1247.) Even "[t]he mere existence of illegal conduct in a workplace does not, without more, render employment conditions intolerable to a reasonable employee." (*Id.* at p. 1254.)

Here, Burroughs recites a number of circumstances that he contends rendered his working conditions intolerable. He asserts he was wrongly "blamed" for the disorganized state of the training records and not given sufficient administrative support despite his repeated requests; was yelled at and humiliated in "meetings" after he raised the issue of the fraudulent OSHA 30 certificate; was "shut out of" the company's investigation; was dissatisfied with how the company handled the investigation; was forced to

give a safety award to Bottarini; was reprimanded for harassing a female employee; was offended by the erectile dysfunction joke made at the meeting in March 2019; and received Becker's inadvertent text expressing concern by Becker that Burroughs "may be trying to add to his arsenal to set up a claim" and a resolve to "be very proactive in squashing [Burroughs'] latest concern." But viewing this evidence in the light most favorable to Burroughs, none of these circumstances creates a triable issue of material fact, whether considered in isolation or collectively

To begin with, Burroughs' briefing overstates the evidence. There is no evidence he was ever denied requested administrative support *after* he alerted the company about the falsified training certificate, much less that he was repeatedly denied such support after doing so.[6] Nor is there any relevant evidence he was treated rudely in multiple "meetings" after raising the OSHA 30 certificate issue, there is evidence of only one such meeting (on January 26, 2018).[7] There also is no evidence that Burroughs was "shut out

---

[6] In deposition he merely testified about the state of the Safety Department's disorganized records *at the time the issue with the foreman came to light in December 2017/January 2018.* Among other details, he testified that "we were struggling to have competent and consistent administrative support to help with that, *which I had asked for going back to 2010.*" (Italics added.) His grievance about staffing, in other words, was pre-existing and was in no way shown to be related to his whistle-blowing activities.

[7] In support of his contention there were multiple such "meetings," Burroughs cites to the declaration he filed in opposition to summary judgment where he averred, ambiguously, that "I voiced my concerns continually to management at executive meetings and through correspondence *and when trying to press the issue was cut off, chastised, interrupted, told to 'shut up,'* and witnessed . . . Ross Bottarini lie in meeting [*sic*] about his knowledge of the falsified certificate." (Italics added.)

of" the company's investigation. Although the head of HR was eventually asked to get involved to find out whether and how the foreman had falsified the training certificate, it is undisputed that Burroughs himself was never prevented from talking to the foreman directly or from investigating the situation further himself.

At bottom then, and viewing the record in the light most favorable to Burroughs, there is evidence that: he was yelled at and treated discourteously during one meeting (not multiple "meetings")—the heated, January 26, 2018 meeting with company management that culminated with the decision to enroll the foreman in OSHA training immediately; six months later (in July 2018), he was required to give a safety award of dubious merit to the very person, Bottarini, that Burroughs believed had been

---

That ambiguous statement is not evidence that there were multiple such meetings, sufficient to create a triable material factual issue.

In the first place, Burroughs' complaint does not allege he was treated rudely when trying to discuss the issue at any meeting other than on January 26, 2018. As Truebeck asserts—without contradiction in Burroughs' reply brief—"Burroughs only alleges a single meeting at which he was told to 'shut up' and 'listen[.]'" It is well-settled that "[t]he materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.'" (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250 (*Conroy*).) Burroughs' declaration filed in opposition to the summary judgment motion cannot enlarge the scope of material issues and is no substitute for an amendment to his pleadings. (See *id*. at pp. 1253-1254.)

Second, the undisputed evidence is that Burroughs discussed the foreman's safety training certificate during only two meetings. He did so, first, at his regularly scheduled meeting on January 8, 2018, with Faulkner and Anderson, at which they did not rebuff his concerns but, on the contrary, instructed Burroughs to immediately get the foreman enrolled in training. He did so again at the heated meeting with company management several weeks later on January 26 where he was yelled at and told to "shut up."

obstructionist and dishonest when the false training certificate issue first surfaced; about five months later still (in December 2018), Burroughs was legitimately reprimanded for making an inappropriate comment to a female colleague[8]; and about three months after that (in March 2019), Burroughs attended a meeting where an offensive erectile dysfunction comment was made that upset him, and later that day after he had complained about the joke to the head of HR, he received an inadvertent text from one of the company's principals, who wanted to be "very proactive" in "squashing" the

    [8] The reprimand Burroughs received for his inappropriate comments was justified (and measured). The company's anti-harassment policy specifically prohibits "[u]nwanted sexual advances" as well as "[v]erbal sexual advances, propositions, requests or comments," and encourages the reporting of inappropriate conduct both by employees who feel they are being harassed and by employees who witness harassment and requires such reporting by all supervisors.

    For the first time in his reply brief, Burroughs asserts "[t]here are triable issues of material fact as to whether [he] committed any violation of the company's policies" regarding sexual harassment. This point is triply forfeited, because it was not asserted below in opposition to summary judgment, it was not made in the opening brief, and it is not explained. (See *Regency Midland Construction, Inc. v. Legendary Structures Inc.* (2019) 41 Cal.App.5th 994, 999 [disregarding arguments not raised below in opposing summary judgment]; *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1426 [disregarding points not made in opening brief]; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand Corp.*) [conclusory arguments are disregarded].)

    Burroughs also implies that he was singled out under the company's anti-discrimination policies for this incident, asserting by way of contrast that "no one was disciplined" after he complained about the erectile disfunction joke in March 2019. He did not allege that the company declined to discipline or respond appropriately to his complaint, however, and so that assertion is irrelevant. (See *Conroy, supra*, 45 Cal.4th at p. 1250). We also disregard his assertion that "no one was disciplined" because it is not accompanied by any citation to the record. (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 156.)

concern Burroughs had raised about the joke and expressed concern that Burroughs might be trying to "set up a claim or something" against the company.

Such evidence is insufficient to raise a triable issue of fact that Burroughs was subjected to intolerable working conditions that effectively forced him to resign.

First, Burroughs has not met his burden as the appellant to demonstrate an error by means of a cogent legal argument, supported by legal authority. (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 146.) He merely discusses general principles of the law concerning constructive discharge followed by a recitation of the evidence, and then just asserts—without legal analysis—that his evidence creates a triable issue of fact on this issue. That is not sufficient to persuade us the trial court erred. " '[O]ne cannot simply say the court erred, and leave it up to the appellate court to figure out why.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237.) An appellate court may, and ordinarily does, disregard conclusory arguments that " 'fail to disclose the reasoning by which the appellant reached the conclusion he wants us to adopt.' " (*United Grand Corp.*, at p. 153.) Here, Burroughs' discussion of general legal principles is of course necessary but ultimately it is not sufficient to persuade us, because what is missing is an analysis of the nature and quantum of evidence that is *sufficient to defeat summary judgment* on a claim of constructive discharge.

Throughout his brief he does cite, without discussing, several cases where the evidence was held sufficient for a jury to find a constructive discharge. (See *Brome v. California Highway Patrol* (2020) 44 Cal.App.5th 786, 801-803 (*Brome*); *Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1258 (*Steele*); *Thompson v. Tracor Flight Systems, Inc.*

21

(2001) 86 Cal.App.4th 1156, 1168-1172 (*Thompson*); *Kovatch v. California Casualty Management Co.* (1998) 65 Cal.App.4th 1256, 1268-1271 (*Kovatch*), disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19; *Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1055-1057(*Valdez*), abrogated on other grounds, *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 813 (2001).)  But merely citing cases does not carry an appellant's burden of demonstrating to us that the trial court erred, *without explaining how the cases apply.*  (See *In re S.C.* (2006) 138 Cal.App.4th 396, 412 [briefing held deficient where appellant includes string citations with no explanation how the authorities support her position; "We reemphasize that is not the role of an appellate court to carry appellate counsel's burden"]; see also *Cinema West, LLC v. Baker* (2017) 13 Cal.App.5th 194, 218-219; *Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 949.)  Moreover, those cases are in no way similar and involved evidence of far more extreme circumstances.[9]  To create a triable

_____

[9] Cf. *Brome*, *supra,* 44 Cal.App.5th at pp. 801-803 (reversing summary judgment for employer where, inter alia, gay highway patrol officer was routinely denied backup assistance due to his sexual orientation thereby placing his life in jeopardy, sought a transfer to escape the harassment and discrimination, and suffered extreme psychological impacts culminating with becoming suicidal; "Viewed as a whole, the record could support a conclusion that [plaintiff's] working conditions became objectively intolerable over time and would have forced a reasonable employee to resign"); *Steele, supra,* 162 Cal.App.4th at p. 1258 (affirming jury verdict that plaintiff suffered intolerable or aggravated working conditions where, after engaging in protected activity, pressure was "steadily ramped up" on her for many months in an effort to cause her to resign, "[w]ork performance issues of arguably dubious merit" were raised but not investigated or resolved, plaintiff was told to start looking for other work because of budgetary crisis when nobody else was so advised and also "threatened with an unjustified, inappropriate and accelerated level of discipline," and her work schedule was manipulated to make her job less desirable); *Thompson, supra,*

factual issue of intolerable working conditions, the evidence must show conduct that is much more aggravated, pervasive and continuous than what the record here shows. (See also, e.g., *Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 579-580 [summary judgment for employer reversed, where plaintiff's evidence showed she and other Filipino employees were consistently demeaned by their supervisor and singled out for criticism; plaintiff was transferred to a job position in circumstances her supervisor knew made it likely she would fail, and falsely accused of conduct that was a terminable offense]; see also *Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 828-829 [complaint adequately pled intolerable working conditions where plaintiff's income was effectively reduced to less than minimum wage as a result of employer's ongoing, wrongful refusal to reimburse him for daily business-related driving

_____

86 Cal.App.4th at pp. 1168-1172 (substantial evidence supports jury verdict that plaintiff was constructively discharged where plaintiff testified her supervisor was always agitated at her and turned all discussions into a "screaming issue," another witness corroborated plaintiff's account of her supervisor's hostility, and evidence showed multiple specific instances of harassment directed at plaintiff, including assigning her a non-managerial task that no other managerial employees were assigned, using a derogatory racial epithet, stealing her business calendar and threatening to transfer her job to another city; the supervisor "intentionally had made it impossible for [plaintiff] to do her job through a continuous course of intimidation and harassment"); *Kovatch, supra,* 65 Cal.App.4th at pp. 1268-1271 (evidence of numerous discriminatory and harassing comments directed at plaintiff based on his sexual orientation and actions that interfered with plaintiff's work performance raised triable issue of fact as to intolerable working conditions); *Valdez, supra,* 231 Cal.App.3d at pp. 1055-1057 (plaintiff alleged facts sufficient to state a claim for constructive discharge where complaint alleged a continuous pattern of discrimination that included discriminatory promotional exams, deprivation of training opportunities, being subjected to a higher standard of performance than other employees, and denial of assignments that could have led to advancement opportunities).

expenses, which left plaintiff unable to pay basic living expenses while also "wearing out the very vehicle he needed to maintain his livelihood"].)

Given Burroughs' failure to grapple in any meaningful way with the case law analyzing claims of constructive discharge *at the summary judgment stage*, we will comment only briefly on the particulars of his argument.

The single January 26, 2018 meeting where he encountered rudeness does not, by itself, raise a triable issue of fact concerning intolerable working conditions. (See *Casenas v. Fujisawa USA, Inc.* (1997) 58 Cal.App.4th 101, 117 (*Casenas*) [single meeting plaintiff attended, even assuming it was intimidating, held insufficient under *Turner* and affirming summary judgment for employer]; see also *Goldsmith v. Mayor and City Council of Baltimore* (4th Cir. 1993) 987 F.2d 1064, 1072 [affirming summary judgment for employer on constructive discharge claim, noting "isolated incidents involving raised voices and flaring tempers described by [plaintiff] simply do not rise to the level of a calculated effort to force her resignation"], cited with approval in *Turner*, *supra*, 7 Cal.4th at p. 1247.)

Nor does the reprimand he received after a female colleague reported that he made inappropriate comments. An employer's investigation into accusations that a plaintiff has behaved improperly "does not create the 'sufficiently extraordinary and egregious' conditions [citation] necessary to trigger a constructive discharge" under *Turner*. (*Simers v. Los Angeles Times Communications, LLC* (2018) 18 Cal.App.5th 1248, 1272-1273 (*Simers*) [holding employer's confidential investigation into allegations of plaintiff's ethical violations did not establish intolerable working conditions that coerced plaintiff to resign].)

The same is true of the "blame" Burroughs received for the disorganized training records. "Criticism of an employee's job performance,

even ' "unfair or outrageous" ' criticism, ' "does not create the intolerable working conditions necessary to support a claim of constructive discharge." ' " (*Simers, supra,* 18 Cal.App.5th at p. 1272 [concluding no substantial evidence supported jury verdict that plaintiff was constructively discharged and reversing].)  It is an everyday possibility inherent in the nature of employment.  " 'In order to properly manage its business, every employer must on occasion review, criticize, demote, transfer, and discipline employees.' "  (*Turner, supra,* 7 Cal.4th at p. 1255; see also *id.* at p. 1247 ["A poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge"].)

The circumstance that the investigation itself was not satisfactory to Burroughs, because it failed to resolve the foreman's inappropriate submission of a faked certification, also falls short of demonstrating intolerable working conditions.  There is no evidence that the manner in which the company chose to address (or not address) the foreman's situation was motivated by retaliatory animus toward Burroughs; Burroughs just disagreed with the judgment of his superiors about whether any further steps regarding the situation were warranted.  His continued dissatisfaction with his employer's *response* to the concerns he was raising does not raise a triable issue of fact as to "unreasonably harsh conditions" of employment sufficient to withstand summary judgment.  (See *Casenas,*  58 Cal.App.4th at p. 116 [where plaintiff attended a meeting and discussed all her grievances with employer, fact that she remained unsatisfied with employer's answers did not warrant denial of summary judgment for employer].)  His dissatisfaction merely "reflects an ordinary, commonplace frustration inherent in the nature of employment."  (*Ibid.*)

Nor, finally, does Becker's inadvertent text to Burroughs on March 8, 2019, the day he complained about the erectile dysfunction joke, create an inference of intolerable working conditions. Burroughs testified in deposition that he resigned when he did because he was worried the company was intending to fire him. And on appeal, he argues that a reasonable person could construe Becker's inadvertent text to him as evidence of his imminent firing, in light of everything else that had transpired earlier. But Burroughs' mere suspicion or speculation about the company's intentions is insufficient to raise a triable issue of fact concerning intolerable working conditions. (*St. Myers v. Dignity Health* (2019) 44 Cal.App.5th 301, 316.) And no reasonable factfinder could construe Becker's text that way. On its face, the text reflects an intent to quickly address Burroughs' concerns about the erectile dysfunction joke Anderson had made in the meeting that day (to "squash" it), because the company was concerned about potential litigation (that Burroughs "may be trying to add to his arsenal to set up a claim or something"). And it is undisputed that Burroughs' supervisor, Pera, immediately tried to contact Burroughs to discuss Burroughs' concerns about the joke, and then emailed Anderson and others the very same afternoon instructing them to end that type of behavior in the future. Both on its face and in light of the undisputed circumstances, Becker's text reflects nothing but an intent to be responsive to Burroughs' complaint about the erectile dysfunction joke. As such, it is not evidence of an employer-coerced resignation but, indeed, the opposite. (See *Turner*, *supra*, 7 Cal.4th at p. 1249 ["An employer's actual knowledge of the existence of [intolerable working] conditions, *and subsequent failure to remedy them*, may constitute circumstantial evidence that the employer deliberately forced the employee to resign"], italics added.) Furthermore, Burroughs cites no authority that an

26

at-will employee's mere worry they may be in danger of getting fired is itself an intolerable working condition sufficient to support a claim of constructive discharge.  On the contrary, the law does not guarantee a stress-free workplace (*id.* at p. 1247), and such a proposition would contravene the principle that the employment relationship "is presumed to be validly terminable at the will of either party, employer or employee, at any time" (*id.* at p. 1252); it also would make it all but impossible for employers to carry out basic functions that are vital to the employment relationship, including performance reviews, compensation reviews or adjustments, job restructurings and employee discipline (see *id.* at p. 1247).

In the end, we recognize that a jury could conclude at most that Burroughs was treated extremely brusquely, even rudely, in the meeting on January 26, 2018; that the safety award he was forced to give to Bottarini a few months later, after the company had concluded its investigation into the fraudulent safety training certificate, was motivated by spite or retaliatory animus; and that, more than a year after the company had concluded its investigation, he was offended by the distasteful joke Anderson made during the March 8, 2019 meeting.  But, collectively, those isolated incidents are not enough to give rise to a finding that the working conditions had become so extreme and intolerable that no reasonable person would choose to withstand them in the interest of earning a livelihood.  (See *St. Myers v. Dignity Health*, *supra,* 44 Cal.App.5th at pp. 317-318 [plaintiff's "litany of complaints fails to raise a triable issue of fact" that she was constructively discharged].)  " ' " 'An employee may not be unreasonably sensitive to his [or her] working environment . . . .  Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work." ' ' " (*Casenas*, *supra*, 58 Cal.App.4th at p. 115 [affirming summary judgment for employer on

27

constructive discharge claim], quoting *Turner*, *supra*, 7 Cal.4th at p. 1247.) At most, they amount to " 'trivial, or isolated acts of [misconduct]' " that, taken together, do not show a continuous pattern of adverse working conditions so intolerable that no reasonable person would choose to stay on the job. (*Turner*, at p. 1247.) Here, it is undisputed Burroughs was never demoted from his position as Safety Director, and that he received bonuses and regular raises throughout his employment, including a $20,000 bonus in both 2017 and 2018 when he was raising issues about the foreman's training certificate. He was promptly reassigned to a new supervisor after complaining that Anderson had missed several of his performance reviews, and it also is undisputed the lack of a regular performance review never prevented him from earning a raise or a bonus. Our Supreme Court in *Turner* held that a resignation in similar circumstances was voluntary, not a constructive discharge, and that therefore the employer was properly granted summary judgment on the employee's claim. (See *Turner*, at pp. 1256, 1259.) Here, as in *Turner*, Burroughs' "attempt to weave unrelated and disjointed events together into an insidious pattern unravels quickly in these circumstances." (*Id.* at p. 1255.) No jury could find that his resignation was, in a word, coerced.

## II.

### *Burroughs' Remaining Causes of Action*

Burroughs' remaining causes of action fail for the same reason. It is unnecessary to examine them, because he acknowledges that *all* of his claims "are based on his contention that he was constructively discharged." Because we have rejected his argument there is a triable issue of fact on that essential element of his claims, the trial court properly resolved all of Burroughs' claims against him on summary judgment.

28

## III.

### *Denial of Leave to Amend the Complaint*

Below, Burroughs asked the trial court to permit him to amend his complaint if the court were otherwise inclined to grant summary judgment. On appeal, he argues that if this court "believes that there is any defect in the allegations" of his complaint, then he should be granted leave by us to amend his complaint.

We reject this contention, for several reasons. The problem here is not the sufficiency of his *allegations* but the sufficiency of the *evidence* he adduced in opposition to summary judgment. In addition, the only manner in which he says he could amend his complaint would not help him. He argues that, if given leave to do so, he could allege: (1) that the false OSHA 30 certificate of completion violated particular federal laws and state regulations that he now specifies, and (2) that the specific public policy that was violated by his wrongful discharge is the policy embodied by Labor Code section 6310. Neither amendment would overcome the problem that he has failed to raise a triable issue of fact as to his constructive discharge, which is a conceded element of each of his causes of action.

## DISPOSITION

The judgment is affirmed. Respondent shall recover its appellate costs.

_____
STEWART, J., Acting P.J.


We concur.


_____
MILLER, J.


_____
MAYFIELD, J.*


*Burroughs v. Truebeck Construction, Inc.* (A161595)

_____

    * Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.